## Case No. 15,037.

### UNITED STATES v. EIGHTY-FIVE HOGSHEADS OF SUGAR.

[2 Paine, 54.] [1]

Circuit Court, D. New York. Dec., 1830. [2]

CUSTOMS DUTIES—FALSE ENTRY—DRAWBACK ON EXPORTATION—REFINED SUGAR.

1. The 84th section of the act of congress of March 2, 1799 [1 Stat. 694], declaring a forfeiture for the entry in the office of the collector, by a false demonstration, of goods, wares or merchandise, for the benefit of the drawback or bounty on exportation, has not been repealed.

2. Sugars entitled to drawback on exportation must have been refined in the United States.

3. What are refined sugars within the meaning of the act of congress, and such as entitle the claimant to the drawback allowed by law upon sugars refined within the United States, and exported therefrom, must be gathered from the commercial sense in which the distinguishing qualities and properties of this commodity are known and understood.

4. The proviso to the act which declares that the forfeiture shall not be incurred if the false denomination happened by mistake or accident, is restricted to mistake of some matter-of-fact, and does not include mistakes as to the construction or application of the law.

5. If the entry was by design, the legal consequence is that it was done to defraud the revenue.

[Cited in U. S. v. 146,650 Clapboards, Case No. 15,935.]

[Appeal from the district court of the United States for the Southern district of New York.]

Between the 24th December, 1829, and 2d January, 1830, entries were made at the custom-house, in New York, by the claimant, of a shipment of about 300 hogsheads and casks of sugar, for the benefit of drawback thereon, as allowed by law upon the exportation of sugar refined in the United States, and made out of foreign sugar. A part of these sugars had been laden on board of the brig Spartan, for Leghorn, and were, by order of the collector, seized and relanded, but all restored except the eighty-five hogsheads in question, which were libelled and tried before the district judge of the Southern district of New York, who denied the claimant's right to enter them for drawback, but decreed their restoration [case unreported], to which cross appeals were taken to the circuit court.

W. Q. Morton, for claimant.

J. A. Hamilton and W. M. Price, for the United States.

For the claimant it was argued as follows: That the phraseology of the various acts of congress, allowing "a drawback upon

---

1 [Reported by Elijah Paine, Jr., Esq.]
2 [Affirmed in 7 Pet. (32 U. S.) 404.]

sugar refined in the United States and exported therefrom," referred to a condition of the commodity answering to the description of "refined sugar," anterior to its being made to assume the appearance of loaf, lump, or bastard sugars. That any of these three descriptions of sugar are produced from "refined sugar," which refined sugar, in the aggregate, constitutes what the law has in view for the allowance of drawback upon exportation; and no matter what subsequent appearance the refiner may cause any portion of that aggregate to assume, whether loaf, lump or bastard, so long as he can show it to retain those properties entitling it to come within the description of "a refined sugar," any and all of those products are without discrimination entitled to the drawback as "refined sugar." As fully sustaining these positions, the case of U. S. v. Pennington [Case No. 16,026], was cited. That bastard sugar is "refined sugar," in point of fact, was contended to have been established by the testimony of a majority of sugar refiners, examined in the present case, and corroborated by the commercial legislation of England, from the year 1765 to 1829. Together with the statutes, the following authorities were cited: Nodin's British Customs, p. 373; Pope, Cust. tits. 221, 225; Commercial Dig. 139. If, however, it should be determined that the sugars in question had been entered by a "false denomination," then, for the claimant, it was contended that he was "mistaken as to the denomination" by which they were entered. But that the evidence produced was sufficient to show that he honestly believed such "denomination" to be "true," and from this conviction, and not from any intention to defraud the revenue, the "mistaken entry" was made. That under the proviso to the 84th section of the act of March 2, 1799 [1 Stat. 695], whenever evidence is offered, the question of "forfeiture" can only be a question of "fact" (turning as it does upon "fraudulent intentions") for the jury to answer to; if before a court in the place of a jury, must be decided by the court as a "question of fact." That the "court" might reserve the question, whether the commodity entered for drawback be of the description within the purview of the legislative acts of congress, as one of "law," wholly separated from "intention," and not involving "forfeiture." That the term "mistake," as contained in the law, of necessity covered as well mistake of law as of fact. That an act may properly be said "to happen by mistake;" though done advisedly and with deliberation. U. S. v. Riddle, 5 Cranch [9 U. S.] 312; Riggs v. Taylor, 9 Wheat. [22 U. S.] 483; Rex v. Smith, 2 Show. 153. That the proceedings on the part of libellants were void "ab initio;" because the subject of exporting sugar refined in the United States with benefit of drawback, was not within the purview of the 84th section of the act of March, 1799,

the same having been impliedly repealed "quoad," sugars refined in the United States, by the acts of July 24, 1813 (chapter 549, §§ 8, 9) 4 Bior. & D. Laws, 565 [3 Stat. 35]; of April, 1816, §§ 6–8, c. 172 [3 Stat. 340]; by section 11, Act April 20, 1818, c. 365, 4 Bior. & D. Laws, 314 [3 Stat. 444]; and by the act of January 21, 1829, c. 11 [4 Stat. 331].

THOMPSON, Circuit Justice. The two questions presented to the court below, were (1) Whether the sugar in question was refined sugar within the meaning of the law? (2) If not, is the owner excused from the forfeiture under the proviso in the 84th section of the act of March 2, 1799? This sugar was entered at the custom-house for exportation as refined sugar, with the view of obtaining the drawback allowed by law in such case. Shortly after it was laden on shipboard, the collector caused the eighty-five hogsheads to be seized and libelled, as forfeited for having been entered under a false denomination. The 84th section of the act of March 2, 1799. 3 Bior. & D. Laws, 219 [1 Stat. 694], declares, that if any goods, wares, or merchandise, of which entry shall have been made in the office of a collector, for the benefit of drawback or bounty upon exportation, shall be entered by a false denomination, and all such goods, wares, or merchandise, or the value thereof, to be recovered of the owner or persons making such entry, shall be forfeited. The allegation in the libel, upon which the forfeiture is claimed, is: That the entry was made by a false denomination of the sugars, with intent thereby to defraud the revenue of the United States. The answer of the claimant denies that the sugars were entered by a false denomination, or with intent to defraud the revenue of the United States, but insists that they were refined sugars within the meaning of the act of congress. The libel does not purport to be founded upon any particular act of congress; but unless it can be sustained under the 84th section of the act of 1799, no law has been referred to, or pretended to exist, upon which it can be sustained. It has been contended on the argument here, that this section of the act, so far as relates to refined sugars, has been repealed. This question was not made in the district court, and I do not think it has been sustained in this court, by any references to the laws of congress. I do not deem it necessary to go into a very minute notice of the various changes of the legislation upon the subject of drawback upon refined sugar.

The first act, allowing a drawback upon sugar refined within the United States, was passed in the year 1794. 2 Bior. & D. Laws, 431, § 19 [1 Stat. 389]. This act was to continue for two years. But by the act of the 3d March, 1795 (2 Bior. & D. Laws, 496, § 20 [1 Stat. 438]), it was continued until the 1st of March, 1801. It was permitted to expire at that time; but the allowance of the drawback was again renewed in 1813 (4 Bior. &

D. Laws, 565, § 8 [3 Stat. 35]), under some different modifications, and continued from time to time by act 1816 (6 Bior. & D. Laws, 160 [3 Stat. 340]), by act of 1817 (6 Bior. & D. Laws, 249 [3 Stat. 401]), and made perpetual by act of 20th of April, 1818 (4 Bior. & D. Laws, § 11 [3 Stat. 444]); and by the act of 21st of January, 1829, the drawback is increased from four to five cents per pound. But in all these various changes and modifications, there is certainly no express repeal of the 84th section of the act of 1799, nor do I discern anything that can be considered an implied repeal, and the objection that there is no act of congress upon which the libel can be sustained, falls to the ground, and the case must rest upon the two questions made and decided in the district court.

1. Were the sugars entered under a false denomination, or, in other words, were they refined sugars within the meaning of the act of congress, and such as entitled the claimant to the drawback allowed by law upon sugars refined within the United States, and exported therefrom? The act of congress has not attempted in any manner to define the distinguishing qualities or properties of this commodity. It is spoken of as an article of merchandise, embraced within the trade and commerce of the country, and presumed to be known and understood by dealers in the article. All laws of this description are made for practical purposes, and are to be construed according to the commercial sense in which they were known and understood. It is not probable that the process of refining sugars entered at all into the consideration of congress; but they legislated upon the subject under a denomination known as an "article of commerce." This necessarily leads to the examination of witnesses, to ascertain whether the sugars in question are refined sugars in this commercial sense; and upon this point a great number of witnesses were examined in the district court, and their testimony has again been brought under the consideration of this court, on the argument here. I deem it unnecessary, however, to go into a critical examination of this evidence. There is, undoubtedly, some contrariety in the opinion of the witnesses; but I think the weight of evidence is decidedly in favor of the conclusion, that the sugars in question were not refined sugars in a commercial sense; and as this is the conclusion to which the district judge came, I am satisfied with adopting the view taken by him, of the evidence upon this branch of the case, by barely remarking, that in all the acts, from the year 1794 down to the present day, the same phraseology is used. The commodity entitled to drawback on exportation, is sugar refined in the United States. We must, therefore, construe the law as applying to an article as understood at that early day, which may in some measure account for the difference of opinion among the witnesses. It is fairly to be collected from the testimony that, as far back as the year '94,

the sugars known in the market as loaf and lump, were those denominated "refined sugars," whether they remained in the loaf or were crushed. But, more recently, an opinion among many seems to have grown up, that every product of raw sugar that has gone through the process of refining, and which can be again converted into sugar, is to be considered as refined sugar; and hence they include, under this denomination, what are usually called "bastars," or "bastard sugars." These, in a certain sense, may be considered refined sugars. But in my judgment, it is very clear, that in a commercial sense, and within the meaning of the law, they cannot be considered refined sugar. The sugars in question were, therefore, entered under a false denomination, and thereby became forfeited, unless the case is brought within the proviso to this same 84th section, which declares that the forfeiture shall not be incurred, if it shall be made to appear to the satisfaction of the court, in which a prosecution for the forfeiture shall be had, that such false denomination happened by mistake or accident, and not from any intention to defraud the revenue.

2. The next inquiry, therefore, is, whether the respondent has made out a case, which under this proviso will save the forfeiture. The district court was of opinion that such a case had been made out, and the sugars were acquitted on this ground; as I have not been able to arrive at the same conclusion, it will be necessary that I should give this part of the case a more particular consideration. It is proper here to notice, that further, and as I think, material testimony, has been taken in this court; and the cause is now to be decided under a different aspect, in some respect, from that presented to the district court. The material facts on this part of the case are few and undisputed. The claimant does not pretend to deny but that the sugars in question are what are called "bastars" or "bastards"; and that he knew them to be such when he entered them for exportation; and his answer and claim asserts that they are refined sugars, entitled to the drawback, and were shipped as such, and without any intention to defraud the revenue. He does not set up in his answer that there was any mistake as to matter of fact, with respect to the quality of this sugar; but with full knowledge of what the sugars were, he assumes the broad ground that they were refined sugars within the meaning of the law. In this he was mistaken in the judgment of the district court, as well as of this court; and the effect of such mistake upon his rights is presented for consideration. A brief notice of the evidence, however, may be necessary in order rightly to judge of the character of the alleged mistake, and to determine how far the claimant is chargeable with an intention to defraud the revenue.

It appears from the evidence that the claimant was repeatedly informed by the surveyor

of the port, and the deputy collector, before this shipment, and, also, by a direct correspondence with the comptroller of the treasury, that he would not be entitled to receive a drawback upon his brown bastars, or bastard sugars, specimens of which he had furnished the collector, and had also sent to the treasury department at Washington; and other specimens had been shown to him at the custom-house, greatly superior in quality to the sugars seized; and he was informed by the custom-house officers that he must conform to those specimens as standards in the exportation of sugars, as refined. The claimant had been exporting large quantities of this article, and disputes and difficulties had arisen between him and the custom-house officers in relation thereto. He was perfectly aware that the sugars he was shipping were of an inferior quality to the specimens which had been shown him at the custom-house, and that he was acting in opposition to the instructions there given, and he well knew that he would not be allowed the drawback if the quality of the sugar should be discovered. It is true that Mr. Phillips, one of the inspectors of the customs, superintended the packing and shipping of the sugars, and gave his permit for the shipment; but this was very properly considered by the district court as having very little influence upon the cause, either as matter of law or as matter of fact; as matter of law, it is only a precautionary measure, but it is no way conclusive. If such permit settled the question as to the quality of the goods, there would be no such thing as a seizure for an entry by a false denomination, when such entry agrees with the permit of the inspector; and as matter of evidence, it afforded no excuse or justification to the claimant; for the inspector, who superintended the packing and shipping of the sugar, was confessedly inexperienced in the article, and allowed it to pass as refined sugar only because he thought it corresponded with the specimens he had seen at the custom-house. But the claimant knew it did not, and he was not in the least influenced or governed by the opinion of the inspector as to the quality of the sugar; he acted with a full understanding that the drawback would not be paid if the quality of the sugar was discovered at the custom-house. The permit of the inspector was, therefore, not only no justification or excuse, but, under the circumstances, might warrant the suspicion that the claimant intended thereby to elude any further examination from the custom-house officers; and the course pursued by the claimant, when the sugars were sent on shipboard, clearly manifested an intention and determination to avoid a more close inspection of those sugars, knowing, from what had taken place, it must result in a denial of the drawback. When he found the inspectors on board the vessel, taking samples of the sugars, under the orders of the collector, he ordered them off. It is true, that after they left the vessel, he told them they might go back and take as many samples as they pleased, which they declined. This circumstance might not be entitled to so much weight, if nothing afterwards of a suspicious character had occurred, particularly as the inspectors returned the next day and proceeded in the examination. But at the close of the day, (being the 31st of December,) it was agreed between the claimant and inspectors, with the consent of the captain, that the vessel should be locked, and no more cargo taken on board until after 9 o'clock on the 2d of January. Before that hour, however, one of the inspectors went on board and found the vessel broken open, and they were taking on board more sugars claimed by Mr. Barlow, who was then present; and on the inspectors' complaining that he was acting in violation of their agreement, he said that they had gone illegally to work, and that he intended to make the collector and all of them sweat for it, (or words to that effect,) and that he should continue loading the vessel until he was stopped by proper authority. On this being reported to the collector, he ordered the seizure to be made.

It is also in proof that the inspectors had laid aside a hogshead of sugar, which they had rejected, as not equal to the specimens furnished them at the custom-house, and by which they were to be governed. Mr. Barlow was not present, but soon after came down, and the inspectors showed him the rejected hogshead. He said: "Very well; let it be." Some time after, on the same day, he said to the inspectors: "I sent that cask down on purpose to try you, to see whether you would pass it." It is fairly to be collected from the evidence, that the rejected cask was one that had been passed by Mr. Phillips.

These are the material and leading facts upon which the protection claimed by the respondent rests. In deciding upon this part of the case, it must be considered as settled that the sugars were entered by a false denomination, and that the forfeiture follows as matter of course, unless the claimant has made out, on his part, that such false denomination happened by mistake or accident, and not from any intention to defraud the revenue. The first inquiry that seems naturally to arise is, what is the nature and character of the mistake which will save the forfeiture? Is it restricted to some matter of fact, or does it include mistakes as to the application of the law to the subject, thus falsely denominated, the qualities of such sugars being fully known to the person making the entry? I cannot think that upon any sound construction the proviso can cover mistakes of the latter description. Such are purely mistakes of law, and it is a principle too well settled to admit of being drawn in question, that ignorance or mistake of law furnishes no excuse in any case, civil or criminal. No good reason is perceived why this maxim should not be applied to the present case as well as to any other. A doubt as to the construction

of a law has never been understood as taking a case out of the application of this rule; and it appears to me that such a doctrine would lead to consequences extremely injurious. There are but few statutes that may not admit of some doubt as to their construction, and it surely cannot be maintained that all who act under a mistaken construction of such doubtful statutes, are irresponsible for their acts. The claimant was fully apprized of the construction given to this act at the custom-house, and knew that the drawback would not be allowed upon the sugars he was shipping if the quality was discovered. But he professed to believe, and probably did believe, that the construction at the custom-house was wrong. And he meant to maintain that bastards were refined sugars, and entitled to the drawback. And he now insists that he is not bound by the custom-house construction, but has a right to have that construction judicially settled. There can be no doubt but that his right, in this respect, stands upon the same footing with other rights protected by law. No man is bound to take the law from the opinion of his adversary. He may appeal to the judicial tribunals of the country to construe the law, and settle his right under it. But he must abide by the consequences if he happens to be mistaken in his view of the law. He cannot claim the right of setting the law at defiance until such judicial construction can be obtained. Such a doctrine is entirely inadmissible. He has a right to have the judgment of the court in the last resort, before he is concluded; but it would be a most extravagant pretension that the operation of the law must be suspended in the meantime. If he chooses to act upon his own construction, and in opposition to that of the custom-house officers and the treasury department, he has a right to litigate this question before the judicial tribunals; but, as in all these cases, he litigates at his peril. And, whether the stake is great or small, can make no difference in principle. It may, perhaps, in some measure, serve to show either his confidence in his own opinion, or his boldness in resisting that of the executive officers of government. A mistake is an error in judgment or opinion, a misconstruction, and may be applied to some matter of law as well as fact; and the intention of the legislature is to be discovered from the subject-matter to which it is applied, and its connection with other words. It is here coupled with the word "accident," "mistake or accident." And as the two words may not import exactly the same thing, there is no more reason to conclude that the former was intended to be applied to matters of law than the latter, which certainly can have no application except to some matter of fact; and both terms, as here used, are properly applied in the same sense. It is very clear that this false denomination did not happen by accident: there was no casualty or any unforeseen or unexpected occurrence which caused the entry by this denomination. It was done deliberately, and by design, and with full knowledge of all the parts and circumstances that attended the transaction. And if the term "mistake" does not include error of judgment as to matter of law, (as I think it does not,) I am unable to discover any ground upon which the false denomination can be said to have happened, by mistake or accident. And the only remaining question is, whether this was done with an intention to defraud the revenue, within the sense and meaning of the proviso; and it appears to me that it follows as matter of course, that if the entry was by design, and not by mistake or accident, the legal consequence is, that it was done to defraud the revenue.

The excuse is to be made out by showing that the false denomination happened by mistake or accident, and not from any intention to defraud the revenue. The evidence shows very clearly that he intended to obtain from the government the drawback, and if he was not entitled to it, he intended to obtain what he had no right to, to the injury of the revenue. The obtaining or withholding wrongfully from another that which is his right, either by deception or artifice, or without his knowledge and consent, is defrauding him of his right. It is possible that he had so firmly persuaded himself that his sugars were entitled to the drawback, that he may acquit himself of any moral turpitude. But the manner in which he attempted to get the sugars on board the vessel, and his declaration to the inspectors, that he sent down the rejected hogshead to try them, manifested a disposition to practice upon what he believed to be the ignorance of the inspectors, and a resort to artifice and deception to elude a full and fair examination of his sugars. A false denomination in the entry happening under such circumstances, surely could not have been considered by the legislature as entitled to favor. Mr. Barlow was not dealing in an article of which he was ignorant. He states in his answer, that he is a sugar refiner, and had been for many years past, and that he himself refined about one half of these sugars. He was not, therefore, in this matter, acting under the advice or representations of others; he was not himself deceived in any respect as to the article. But with full knowledge of the qualities of the sugar, and with full knowledge that he was acting in opposition to the opinion of the collector and comptroller, through whom he must obtain the drawback, and that some artifice must be resorted to in order to effect this, he enters these as refined sugars which, in the judgment of the district court and of this court, was a false denomination. Admitting that he himself honestly believed that his sugars were refined sugars within the meaning of the law, and that he was entitled to the drawback, still it amounts to no more than a mistake or error of judgment upon the law, and does not protect the sugars from

forfeiture. I am, accordingly, of opinion that the case is not brought within the proviso of the 84th section of the act of March 2, 1799, and that the decree of the district court must be reversed, and a decree of condemnation entered.

[On appeal to the supreme court, the decree of this court was affirmed. 7 Pet. (32 U. S.) 404.]

See the following cases: U. S. v. Nine Packages of Linen [Case No. 15,884]; U. S. v. One Case of Hair Pencils [Id. 15,924]; U. S. v. Four Part Pieces of Woollen Cloth [Id. 15,150]; U. S. v. Six Hundred and Fifty-One Chests of Tea [Id. 12, 916]; U. S. v. Ninety-Five Bales of Paper [Id. 10,274].